eFiled
8/27/2025 2:48:06 PM
Superior Court
of the District of Columbia



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

*OA*

K. L. Smith
_____
                                    Plaintiff
                vs.
                                                Case Number    **2025-CAB-004825**
Donald John Trump
_____
                                    Defendant

## SUMMONS

To the above named Defendant:

  You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

  You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

Name of Plaintiff's Attorney

**3659 Evergreen Pkwy. #504**          By _____

Address
**Evergreen, CO 80437**
                                        Date          **August 28, 2025**
**(720) 404-5383**

Telephone
如需翻译，請打电话 (202) 879-4828 Veuillez appeler au (202) 879-4828 pour une traduction Để có một bản dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시요. የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

  If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



Civil Division

SEP   8 2025

US Attorney's Office DC

CV-3110 [Rev. June 2017]               Super. Ct. Civ. R. 4

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

K. L. SMITH, 3649 Evergreen Pkwy. #504
Evergreen, CO 80437-0504

   *Petitioner,*

v.

DONALD JOHN TRUMP, in his personal capacity only,
1600 Pennsylvania Ave., Washington, DC 20500

   *Respondent.*

---

## VERIFIED PETITION FOR LEAVE FOR ISSUANCE OF RELIEF
## IN THE NATURE OF A WRIT OF QUO WARRANTO

---

Comes now the Petitioner, *in propria persona*, stating the following in support of this Verified

Petition for Issuance of Relief in the Nature of a Writ of Quo Warranto:

### INTRODUCTION



*In free Governments the rulers are the servants, and the people their superiors and sovereigns.*
   ~Benjamin Franklin, July 26, 1787

 The controlling law in this case is not amenable to reasonable dispute. First and foremost, the
Fourteenth Amendment is self-executing.[1] Second, the unambiguous text of the foundational law

---

[1] This fact is resolved by resort to the bulletproof reasoning of Chief Justice Marshall, in the first case we all studied in law school:

> The constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it.

> If the former part of the alternative be true, then a legislative act contrary to the constitution is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable.

that we the People enacted controls. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (per Thomas, J., collecting cases). Thereunder, any individual who has previously "taken an oath ... to support the Constitution of the United States" and found to have "engaged in insurrection or rebellion against the same" shall not "hold any office, civil or military, under the United States," unless Congress, in their infinite wisdom, "by a vote of two-thirds of each House, remove[s] such disability." U.S. Const. amend. XIV, § 3. And most importantly, **as a matter of law, the actions of a usurper are void ab initio**:

> [W]hen the constitution or form of government remains unaltered and supreme, there can be no de facto department, or de facto office. The acts of the incumbents of such departments or office cannot be enforced conformably to the constitution, and can be regarded as valid only when the government is overturned.

*Norton v. Shelby County*, 118 U.S. 425, 443 (1886).[2]

It is a hard ban. Like the requirement that a Senator be over thirty, have been a citizen for at least nine years, and an inhabitant of the State you purport to serve. U.S. Const. art. I, § 3, cl. 3.

---

*Marbury v. Madison*, 5 U.S. 137, 177 (1803).

There is no support in precedent or logic for the proposition that a constitutional provision must be activated by formal legislation to become effective. *E.g., United States v. Stanley (Civil Rights Cases)*, 109 U.S. 3, 20 (1883) ("the Thirteenth amendment, as well as the Fourteenth, is undoubtedly self-executing without any ancillary legislation"), *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997) (Fourteenth); *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) (Fifteenth).

Any doubt on this score was laid to rest by the tale of Col. Nathan Tift. Upon the readmission of Georgia to representation, Tift was elected as a Democrat to the Fortieth Congress. The Fourteenth Amendment was ratified on July 9, 1868—presumably, while Tift was *en route*. But rather than remove Tift's disability, Congress passed a private bill **enabling him to serve out that Term—but no more**. "Congress enacted a private bill to remove the Section 3 disability of Nelson Tift of Georgia, who had recently been elected to represent the State in Congress. See ch. 393, 15 Stat. 427. Tift took his seat in Congress immediately thereafter. See Cong. Globe, 40th Cong., 2d Sess., 4499-4500 (1868)." *Trump v. Anderson*, 601 U.S. 100, ___, 144 S. Ct. 662, 669 & n.2. And Georgia sent six secessionists to the Forty-First Congress where the members refused to seat, including Nathan Tift. Biographical Directory: Forty-First Congress at 179 & fn. 11, https://www.govinfo.gov/content/pkg/GPO-CDOC-108hdoc222/pdf/GPO-CDOC-108hdoc222-3-41.pdf

[2] This conclusion is consistent with our concept of popular sovereignty, foreign to our British forebears. The Framers' views were consonant with that of Locke, who maintained that a usurper could never attain legitimate power. John Locke, *Second Treatise of Government* ch. XVIII (1689). E.g., John Adams, *Novanglus* No. 5, Feb. 20, 1775; Thomas Jefferson, *Kentucky Resolution* (1798) (acts in excess of jurisdiction are void *ab initio*); George Washington, *Farewell Address* (Sept. 19, 1796) (the Constitution is the outer boundary of popular consent); Federalist No. 84 (Hamilton) (same). The stirring prose of Thomas Paine distills the thought. "[I]n America **THE LAW IS KING**. For as in absolute governments the King is law, so in free countries the law ought to be King; and there ought to be no other." Thomas Paine, *Common Sense* (Philadelphia, R. Bell, 1776) (emphasis in original), reprinted in pt. III, ¶ 103 (Project Gutenberg, 1994). As long as we remain governed by the Constitution, either an occupant of an office has a legal right to discharge the duties of an office, or s/he does not. There is no third option.

This is in direct contrast to the experience in medieval England during the Wars of the Roses (1455-1487), where factions vied over the kingship. As it wasn't entirely clear who the actual King was, Parliament enacted *The Treason Act*, 11 Hen. VII [1495], c. 1 ("noe person going wth the Kinge to the Warres shalbe attaynt of treason"), creating the de facto officer doctrine. Translated from the Middle English, it forbade legal punishment of subjects who followed the orders of the de facto king, irrespective of whether he was legitimate or a usurper. **Importantly, it is NOT a common-law doctrine.**

You have to be twenty-one to get into the strip club. The only difference is that it is not necessarily a *permanent* ban. U.S. Const. amend. XIV, § 3.

The only question of law properly before the Supreme Court in *Trump v. Anderson* was whether "the Colorado Supreme Court err[ed] in ordering President Trump excluded from the 2024 presidential primary ballot," *Trump v. Anderson*, No. 23–719, 601 U.S. 100 (2024), Pet. Br. at (i). As such, the question of whether Trump could legally serve as President was never before the Court. Accordingly, the only facts that matter—that Trump took the requisite oath, and that he was found to have engaged in insurrection—were left undisturbed. The doctrine of collateral estoppel prohibits relitigation of an issue of fact or law that has been decided in earlier litigation. As there is no reason why Congress couldn't have removed Trump's disability, there was no reason why he couldn't have stood for re-election—as Col. Tift did.[3] *Trump v. Anderson* was correctly decided 9-0, on the only question properly before it.

## I.  D.C. CODE § 16–3501 WAS INTENDED TO ENFORCE SECTION 3

This is going to seem like inside baseball—something even legendary pundits missed.[4]  Congress was vested "with power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. Not just Section 3, but the entire Fourteenth Amendment. With respect to Section 3, they enacted the Enforcement Act of 1870, imposing a "duty" on local federal district attorneys to bring civil actions in federal court to remove anyone holding nonlegislative office—federal or state—in violation of Section 3. Enforcement Act of 1870, §14, 16 Stat. 143 (1870). And for whatever reason, as part of its supervision of the District, it enacted the predecessor to D.C. Code 16-3501, *et seq.,* which has the same effect. When they ran out of Confederates to remove, Congress repealed the portion of the Act imposing a duty on prosecutors, 35 Stat. 1153–1154, 62 Stat. 992–993), but the common law remedy in the nature of quo warranto remained, *United States ex rel. State of Wisconsin v. First Federal Sav. & Loan Ass'n*, 151 F. Supp. 690 (E.D. Wisc. 1957), as did the parallel D.C. Code provision. *Newman v. United States ex rel. Frizzell*, 238 U.S. 537 (1915). And it remains available today, consistent with the Framers' design.

Under the Framers' Constitution, the citizen was not an idle spectator. As Harvard's legendary Raoul Berger proved, every citizen enjoyed standing in public interest cases.[5] In England, "[e]very subject,' said Justice Lush, "has an interest in securing that public duties shall be exercised only by those competent to exercise them .... "[6]  The law was identical on both sides of the Pond until the

---

[3] The tale of Nathan Tift provides controlling precedent. That the framers of the Fourteenth Amendment intended it to be self-executing is proven by their conduct: If they needed to pass legislation to effectuate it, they wouldn't have needed to pass a private bill to let him into the Fortieth Congress, and would have had no right to exclude him from the Forty-First.

[4] J. Michael Luttig and Laurence H. Tribe, Supreme Betrayal, *The Atlantic*, Mar. 14, 2024.

[5] Raoul Berger, *Standing to Sue in Public Actions: Is it a Constitutional Requirement?*, 78 Yale L.J. 816, 819 (1969) ("No English court, so far as I can discover, has ever rejected the authority of *Articulo Cleri* or denied that a writ of prohibition may be granted at the suit of a stranger."). In particular, quo warranto was available to a stranger in *Rex v. Smith* [1790] 100 Eng. Rep. 740, wherein it was observed that "the ground on which this application is made is to enforce a general Act of Parliament, which interests all the corporations in the kingdom; and therefore it is no objection that the party applying is not a member of the corporation." *Berger,* 78 Yale L.J. at 823 & n. 38.

[6] *Berger, Id.* at 823 & n. 39 ("In 1915, Lord Reading observed that "a stranger to a suit can obtain prohibition. ... and I see no reason why he should not in a proper case obtain an information of quo warranto." ... "Every subject,' said

Taft Court invented 'standing' as part of their crusade to turn "Supreme Court Justice" into a part-time job in *Frothingham v. Mellon,* 262 U.S. 447 (1923).  Moreover, Professor Berger adds that "[n]o hint that judicial restraint of legislative usurpation was to hinge on the suitor's 'interest' is to be found in the records of the Constitutional Convention." Berger, *Standing to Sue* at 829.  Professor Jaffe concurs, arguing that "the public action—an action brought by a private person primarily to vindicate the public interest in the enforcement of public obligations—has long been a feature of our English and American law." Louis L. Jaffe, *Standing to Secure Judicial Review: Private Actions*, 75 Harv. L. Rev. 255, 302 (1961).  (Petitioner has standing and will plead those facts out of an abundance of caution, but this is strictly unnecessary.)

The right to have public duties exercised by "those competent to exercise them" is a common law right, for which there was a remedy enforceable in chancery court. "The common law ... ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose," *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603, 623 (1813); *accord, United States v. Texas*, 507 U.S. 529, 534 (1993) (quotations and citations omitted). All the common law writs were available. Judiciary Act of 1789, ch. 20, § 14, 1 Stat. 73, 81-82 (1789).  The practice is consistent with the Framers' design, the common law, and the concept of popular sovereignty.[7]

This self-evident axiom is proven by the obverse: Our servants in government work for us, but we have no way of ensuring that they act within the bounds of their agency?  To even state the case is to refute it.  And 1600 Pennsylvania Avenue just happens to be within the District.

## II.  TIME IS OF THE ESSENCE

*Fiat iustitia, ruat cælum!!!*  Let justice be done, though the heavens fail.  The Constitution does not only apply when applying it is easy.  The systematic failures that led to the ascension of Donald Trump will not be easy to unwind, but "easy" is not an element of any cause of action that I learned of in law school.  The pardons?  Void.  The Executive Orders?  Void. Allegator Auschwitz?  Closed.  The One Big Billionaire Bailout?  A nullity. (You need the signature of a President to make a law.) The EPA and National Weather Service?  Restored.  But the longer this is delayed, the harder that this will be to unwind.  Time, therefore, is of the essence.

The Constitution is our national catechism. And thereunder, "everyone, from the President on down, is bound by law." *Trump v. CASA, Inc.,* No. 24A884, 606 U.S. ___ (2025) (Application for Stay granted Jun. 27, 2025), *slip. op.* at 23, 24.  I can't argue with Justice Barrett (or Justice Jackson) on this point.  **Compliance is not optional.** *United States v. Peters*, 9 U.S. 121, 126 (1795); *Cohens v. Virginia*, 16 U.S. 264, 404 (1821); *see Ex parte Fitzbonne* (U.S. unreported 1800) (court has a duty to exercise the authority it has).

This case isn't about right or left; it's about right and wrong.

---

Justice Lush, "has an interest in securing that public duties shall be exercised only by those competent to exercise them .... ").

[7] Collusive suits without adverse parties fail the "Cases or Controversies" test of Article III, § 2, cl. 1, *Muskrat v. United States*, 219 U.S. 346 (1911). The Privy Council gives advice to the Crown; beyond that, the concept of advisory rulings appears foreign to the common law. See *Ashby v. White* [1703] 92 Eng. Rep. 126, 136 (H.C.) (for every right, there must be a remedy).

## III. WHY ISSUANCE OF A QUO WARRANTO NOW IS IMPERATIVE

The mechanics of the controlling statute are equally explicit. This is public interest litigation, nominally engaged in by the Attorney General or the United States Attorney for the District. As it involves the assurance of governmental integrity and self-evident conflicts exist, any actual litigation would presumptively be handled by the Public Integrity Section of the Department of Justice ("DOJ"), which has enjoyed traditional independence.

### But that was then. This is now.

Based on an avalanche of credible published reports, the current Attorney General and her underlings appear to be engaged in a Soviet-style purge of the entire DOJ, firing everyone from the lead ethics attorney to those who brought the January 6 seditionists to justice to anyone who would not engage in unethical conduct on command. As one whistle-blower put it, the current DOJ is "thumbing its nose at the courts, and putting Justice Department attorneys in an impossible position where they have to choose between loyalty to the agenda of the president and their duty to the court." Devlin Barrett, Justice Dept. Whistle-Blower Warns of Trump Administration's Assault on the Law, *N.Y. Times*, Jun. 10, 2025. For reasons expounded on at greater length in the body of this petition, the DOJ just isn't up to this task.

As expecting this band of scofflaws to discharge their duties is unreasonable, the law does not ask that a litigant "commit a futile act," *Houghton v. Shafer*, 392 U.S. 639, 640 (1968) (citations omitted), and the right to relief cannot reasonably be disputed, Petitioner asks that an appropriate writ issue from this Court without delay.

### VERIFIED PETITION FOR RELIEF

1.  Petitioner K.L. SMITH, a United States citizen and resident, respectfully submits this petition as a relator in the public interest to challenge the unlawful holding or exercise of a public office, pursuant to D.C. Code § 16-3503.

2.  As a United States citizen, Petitioner is harmed by Respondent DONALD JOHN TRUMP's unlawful exercise of the office of the Presidency, which undermines constitutional governance and the rule of law, affecting my rights and the public's interest in lawful administration.

3.  Petitioner swears under penalty of perjury that, for reasons stated herein, the Respondent's occupation of the office of the Presidency violates Article II, Section 1, Clause 5 of the United States Constitution, as an oathbreaking adjudged insurrectionist may not serve in that office unless

and until Congress, "by a vote of two-thirds of each House, remove[s] such disability." U.S. Const. amend. XIV, § 3.

4. Venue is proper in this matter as the office of the Presidency is located at 1600 Pennsylvania Avenue, Washington, DC 20500, and a significant portion of the actions pertinent to this matter either have occurred or will occur within this District, and Respondent is subject to jurisdiction there. 28 U.S.C. § 1391(b).

5. Jurisdiction is conferred by D.C. Code § 16–3501 (usurpation).



6. "The Attorney General of the United States or the United States attorney [for the District] may institute a [quo warranto] proceeding … on his own motion." D.C. Code § 16–3502.

7. "If the Attorney General or United States attorney refuses to institute a quo warranto proceeding on the request of a person interested, the interested person may apply to the court by certified petition for leave to have the writ issued." D.C. Code § 16–3503.

8. Whereas it is normally customary and proper for a petitioner to defer to the Attorney General and/or United States Attorney and in such weighty matters, assigned to the independent Public Integrity Section of the Justice Department's Criminal Division, Justice Manual, Title 9-85.100, the Trump Administration has effectively disemboweled the Section by slashing its staff by over 80%--apparently, as "part of a broader Trump administration effort to weaken or altogether

6

dismantle guardrails designed to protect good government and fair play in business and politics." Alanna Durkin Richer and Eric Turner, Justice Department is expected to slash public corruption unit, AP sources say, *Assoc. Press*, Mar. 11, 2025.

9. Whereas it is normally customary and proper for a petitioner to defer to the Attorney General and/or United States Attorney, both are nominally answerable to the President, and are engaged in a conscious purge of any attorney who would not sacrifice his or her bar card in the service of the person whose right to occupy the office is challenged herein:

> [Petitioner is acutely aware that the allegations summarized below are serious and, in some instances, unproven. They are not offered to establish criminal liability but rather, to demonstrate that both the Attorney General and interim U.S. Attorney suffer from grievous and publicly documented entanglements and credibility issues that render any expectation of good-faith action under D.C. Code § 16–3502 objectively unreasonable.]

a. **Pamela Jo Bondi** has been an ethical train-wreck since she burst onto the national scene.

Nothing quite says "I don't want to be bothered by ethics" quite like firing your personal ethics adviser—the head of "the DOJ's ethics office, [whose] portfolio included reviewing and approving financial disclosures, recusals, waivers to conflicts of interest, and advice on travel and gifts for Bondi, Deputy Attorney General Todd Blanche, FBI Director Kash Patel, and other DOJ leaders." Ben Penn, Bondi Fires Her Personal Ethics Chief as DOJ Purge Continues, *Bloomberg Law*, July 14, 2025. In turn, that appears to be the short tour of her professional public life.

1. "When You Give, They Do Whatever the Hell You Want Them To Do"

Trump became acquainted with Bondi when he gave her a $25,000 ~~bribe~~ *campaign contribution* from one of his charities to get rid of the Trump University investigation. Jose Pagliery, The Real Story Behind the $25,000 Trump Donation to Pam Bondi, *The Daily Beast*, Aug. 26, 2021, The Orlando Sentinel's Scott Maxwell summarizes the case:

> One day, Bondi's office told this newspaper it was reviewing complaints from Floridians who said they felt swindled by the Trump Institute affiliate of Trump University. Four days later, Trump's foundation cut a $25,000 check to Bondi's campaign committee.

> Then, after the check came in, her office decided not to take any action against Trump.

> Bondi — whose own spokesman said Bondi personally asked Trump for the money — says the two things weren't related. …

Imagine you were robbed and the prosecutor gave the suspect a pass after taking $25,000 from him. There would be universal outrage — and rightfully so. This is not the behavior of an ethical prosecutor.

Scott Maxwell, New records show Bondi needs probing in Trump mess, Maxwell says, *Orlando Sentinel*, updated Jun. 12, 2018 (original Sept. 2016). And for his part, Trump doesn't deny it: "As a businessman and a very substantial donor to very important people, **when you give, they do whatever the hell you want them to do**," Trump told the *Wall Street Journal* in July 2015." Nick Gass, Trump's pay-for-play scandal intensifies, *Politico*, Sept. 7, 2016 (emphasis added).

An ethical prosecutor would not accept the check. In that incident, Bondi displayed the lack of personal character that made her a perfect fit for the second Trump Administration.

2. Loyalty Before Honesty

The most concerning manifestation that Bondi has used her offices for political purposes is when she fired a line attorney for the unforgivable sin of telling the truth to a tribunal in the *Abrego-Garcia* case. Sadie Gurman, He Represented Contentious Immigration Cases for the Government. His Candor Lost Him His Job, *Wall St. J.*, Apr. 15, 2025. But by far the most alarming act by Trump's appointees was the wholesale firing of prosecuting dozens of prosecutors for the unthinkable act of ... prosecuting people who had participated in the violent insurrection on January 6th. Kyle Cheney and Josh Gerstein, DOJ fires dozens of prosecutors who handled Jan. 6 cases, *Politico*, Jan. 31, 2025.[8]

In a spectacle reminiscent of Nixon's Saturday Night Massacre[9]—petitioner is old enough to remember—the seven attorneys leading the Justice Department's Public Integrity Section resigned after refusing to participate in a deal wherein a corruption prosecution of New York City mayor Eric Adams would be suspended, provided that Adams agreed to be Trump's supplicant. Scott MacFarlane, et al., Top DOJ officials, Manhattan federal prosecutor resign after receiving orders to drop Eric Adams case, *CBS News*, Feb. 14, 2025.

But the Valentine's Day Massacre at DOJ was infinitely worse. According to retired U.S. Attorney Barb McQuade, "DOJ leadership has put all Public Integrity Section lawyers into a room with 1 hour to decide who will dismiss Adams indictment or else all will be fired."

---

[8] It did not end there. Lifer Denise Cheung was forced to resign, rather than pursue a criminal case without what she concluded was adequate predication. Read the resignation letter by Denise Cheung, a veteran D.C. federal prosecutor, *Wash. Post*, Mar. 6, 2025. Trump commands an army of berserkers who stand ready to do his bidding, and Bondi seems to be leading the charge. *See* David Gardner, Pam Bondi Warns 'Deranged' Judges: 'We Are Coming for You', *Daily Beast*, Apr. 25, 2025. Instead of emphasizing loyalty to the Constitution, she demands loyalty to the President: "The discretion afforded Department attorneys entrusted with those responsibilities does not include latitude to substitute personal political views or judgments for those that prevailed in the election." Pamela Bondi, "General Policy Regarding Zealous Advocacy on Behalf of the United States," *Memo*, Feb. 5, 2025.

[9] In his attempt to cover up the Watergate scandal, President Nixon ordered Attorney General Elliot Richardson and Deputy Attorney General William Ruckelshaus to fire Special Counsel Archibald Cox. Both men refused and resigned. Solicitor General Robert Bork, third in line at the Department of Justice, fell on his sword and fired Cox; he was eventually rewarded with a seat on the D.C. Court of Appeals and eventually, nomination for a seat on the Supreme Court. Loyalty is highly prized in the upper echelons of the Republican Party; character is not. (Full disclosure: Petitioner was an active R for decades, serving on numerous occasions as a state convention delegate.)

Josh Gerstein, Justice Department in crisis over Eric Adams showdown, *Politico*, Feb. 14, 2025.

The Valentine's Day Massacre is a unique window into the character of DOJ leadership under Ms. Bondi. Hagen Scotten, one of the Public Integrity attorneys who resigned in protest, distilled the controversy to essentials: "No system of ordered liberty can allow the Government to use the carrot of dismissing charges, or the stick of threatening to bring them again, to induce an elected official to support its policy objectives." Hagan Scotten, E-mail (to Emil Bove), Re: *United States v. Eric Adams*, 24 Cr. 556 (DEH).[10]

For Scotten—"an Iraq War veteran and Bronze Star recipient who clerked for Chief Justice John Roberts at the Supreme Court and at an appeals court for Justice Brett Kavanaugh," and a registered Republican, Gerstein, Justice Dept. in Crisis, supra., this was not about partisan politics. This is about the rule of law. **And character**. In Pam Bondi's DOJ, blackmail for political purposes is "Tuesday." And she can be expected to act in the public interest, as opposed to Donald John Trump's?

Understand what is at stake here. If this Petition is unsuccessful, a supine Senate will hand Emil "f*ck the courts" Bove a lifetime sinecure on the Third Circuit Court of Appeals. Josh Gerstein and Kyle Cheney, Internal DOJ messages bolster claim that Trump judicial nominee spoke of defying court orders, *Politico*, Jul. 10, 2025. And at the risk of stating the obvious, a not-President can't appoint Article III judges.

The wholesale purge of Justice Department attorneys not loyal to Donald Trump reportedly continues even today. As *Forbes* reports, "Attorney General Pam Bondi fired at least nine Justice Department prosecutors and staffers who worked on criminal cases against President Donald Trump this week, according to multiple reports, the latest terminations of administration staff believed to be against the president." Alison Durkee, Pam Bondi Fires DOJ Staffers Who Worked On Trump Cases Amid Chaos at Agency, *Forbes*, Jul. 12, 2025. "Multiple people familiar with the Justice Department said scores of experienced staffers are opting to voluntarily leave the government to avoid being fired at random or asked to do things that would potentially violate their legal ethics." Perry Stein, Firings without explanation create culture of fear at Justice Dept., FBI, *Wash. Post*, Jul. 10, 2025. Two-thirds of the lawyers in the Federal Programs Branch, charged with defending Administration policies, have left or are leaving their positions. Andrew Goudsward, Two-thirds of the DOJ unit defending Trump policies in court have quit, *Reuters*, Jul. 14, 2025; Ewan Palmer, DOJ Lawyers Quit in Droves After Being Ordered to Defend Trump, *DailyBeast*, Jul. 14 2025. Et al., AD NAUSEAM. "It should alarm all Americans that the leadership of the Department of Justice appears to value political loyalty above the fair and responsible administration of justice," said Liz Oyer, who was fired for insufficient loyalty to The Don. Fired Justice Department pardon attorney accuses the agency of 'ongoing corruption,' abuse of power, *Assoc. Press*, Apr. 07, 2025.

I'm not sure whether to call it a purge of the DOJ … or a decapitation.

---

[10] The e-mail is undated, but written at some time after February 12 and before it was posted by Josh Gersten of Politico on February 14. https://www.documentcloud.org/documents/25536274-scottenltr02xx25/

3.  <u>Pedophile Games: Making the Epstein Scandal 'Go Away'</u>

Bondi is also in the news for making the Epstein scandal 'go away.' "'You still talking about Jeffrey Epstein?' Mr. Trump, visibly exasperated, asked a reporter at a cabinet meeting on Tuesday, the day after the Justice Department released a memo concluding that 'no further disclosure would be appropriate or warranted' in the investigation of Mr. Epstein." Glenn Thrush and Stuart A. Thompson, Confronted Over Epstein Files, Trump and Bondi Tell Supporters to Move On, *N.Y. Times*, Jul. 8, 2025. This appears to be calculated to protect Trump, who is all over the files and credibly identified as "Doe #174." *E.g.,* Tom Norton, Is Donald Trump 'Doe 174' in Jeffrey Epstein Documents? What We Know, *Newsweek*, Jan. 10, 2024 (*Business Insider* did the heavy lifting, but their story is now behind a paywall). Before he met his untimely demise, Epstein claimed Trump as one of his besties for decades[11] and, in the words of James Comey, "Lordy, there are tapes!" "[Journalist Michael] Wolff claims the excerpt tape is a mere fraction of some "100 hours of Epstein talking about the inner workings of the Trump White House and about his longstanding, deep relationship with Donald Trump." Edward Helmore, Jeffrey Epstein details close relationship with Trump in newly released tapes, *The Guardian* (U.K.), Nov. 1, 2024. A witness told investigators that Trump "had sex with many girls." Jen Smith, et al., Donald Trump named in latest Epstein documents: Sarah Ransome said he had sex with 'many girls' in email where she also claimed pedophile had tapes of the ex-president, Richard Branson, Prince Andrew, Bill Clinton, *DailyMail* (U.K.), Jan. 8, 2024. Alan Dershowitz, who represented Epstein in the infamous 2008 plea deal, Ben Sales, Dershowitz Has No Regrets Over Role in Jeffrey Epstein's 2008 Plea Deal, *Ha'aretz*, Jul. 15, 2019, claims that he has seen all the documents. Sean Spicer, Alan Dershowitz: "I've Seen ALL the EPSTEIN DOCUMENTS," YouTube, https://www.youtube.com/watch?v=8Esfvoxrm9g (Apr. 2025).

Powerful men, raping children with impunity? **Yeah, we're still talking about it.**

4.  *The Dog Ate My Homework: The Mystery of the Disappearing Files*



PAM BONDI
UNITED STATES ATTORNEY GENERAL
No, you know what it is, though? There are tens and thousands of videos and it's all with little kids. So they [FBI] have to go through every one.[12]

Do (or shall I say, "*did*"?) the tapes exist? Ransome's claims are corroborated by none other than Bondi herself. In her own voice, more than once. "There are tens and thousands

---

[11] Trump defenders claim that the fact that Epstein was barred from Mar-a-Lago is conclusive evidence that he was not part of the debauchery. Unsurprisingly, that has been called into question. Bess Levin, Of Course Trump "Fell Out" with Epstein Over Real Estate, Not Underage Girls, *Vanity Fair*, Aug. 1, 2019. Less than three weeks after the incident, the Feds got an anonymous tip from someone with intimate knowledge of the operation. Trump is notoriously vindictive. The list of suspects is short.

[12] O'Keefe Media Group, X (July 8, 2025, 10:35 PM), https://x.com/OKeefeMedia/status/1942714206840615065.

of videos and its all with little kids." According to the Associated Press, "Bondi appeared at the White House, where she said: 'There are tens of thousands of videos of Epstein with children or child porn.'" Eric Tucker and Alanna Durkin Richer, Takeaways from AP's report on Attorney General Bondi's comments about evidence in Epstein case, *Assoc. Press*, Jul. 1, 2025.[13]

This might be less problematic, but for an interview on *Fox News*, where a host asked: "DOJ may be releasing a list of Jeffrey Epstein's clients; will that really happen?" While he asked, Bondi nodded her head in agreement. Her response: "It's sitting on my desk right now."[14] Add that to the one minute of missing surveillance video, Kelly Rissman, Minute-gap in Jeffrey Epstein jailhouse video released by DOJ fuels conspiracy theories, *The Independent* (U.K.), Jul. 8, 2025, a suit by victims alleging that the FBI was engaged in a coverup, Jonathan Stempel, Jeffrey Epstein victims sue FBI, allege coverup, *Reuters*, Feb. 14, 2024, the reactions of victims, Juliette Rose Bryant, X (July 8, 2025, 3:06 PM), https://x.com/JulietteBryant/status/1942601265130922084 ("victims are being found dead"), and the about-face is incriminating on its face. Jack Silver, Pam Bondi Has Yet to Explain Where the 'Tens of Thousands' of Epstein Child Porn Videos Are, *Daily Beast*, Jul. 1, 2025.[15]

Politically, going after Epstein's johns might be the easiest sell since ice in the desert, and Trump's MAGA base is having kittens over it.[16] So, why is she closing the case? The only logical answer is that Attorney General Bondi appears to be using her office for the purpose of protecting Donald Trump. It logically follows that AG Bondi would never prosecute a case that would remove her long-time patron from office.

b. **Jeanine Ferris Pirro** is an infamous partisan flamethrower, known more for her cable TV show than her legal prowess. She hasn't darkened the door of a courtroom for well over

---

[13] Veteran investigative reporter Tara Palmeri alleges that her FBI sources tell us that the tapes exist, Tara Palmeri, Pam Bondi has no credibility on Jeffrey Epstein, *The Tara Palmeri Show* (Youtube video), Jul. 8, 2025, https://www.youtube.com/watch?v=D5xKJT_jKuk, and a 60 Minutes producer reportedly tricked Ghislane Maxwell into admitting that tapes existed. Daniel Bates, Ghislaine Maxwell admitted Jeffrey Epstein DID have tapes of Trump and the Clintons after she was tricked by 60 Minutes producer in 2016 - 'but refused to locate them because she wanted Hillary to win', *DailyMail* (U.K.), Feb. 18, 2021.

[14] Robby Starbuck, X (July 7, 2025, 2:42 AM), https://x.com/robbystarbuck/status/1942051481542160409. ; the embedded video is what matters. From the clues on the screen, it was likely aired on Feb. 21, 2025 at 1:11 P.M. EST, as Lara Trump's show was to premiere the next day.

[15] The only way those files disappear is that they get disappeared, and it would be truly remarkable if Epstein didn't keep tapes. Whether he was part of a Mossad or even KGB honeypot operation can be left to speculation, but there is credible evidence that Trump did rape a 14-year-old girl going under the pseudonym "Katie Johnson." Tufayel Ahmed, Trump Teen Rape Allegation Resurfaces, Ronan Farrow Claims National Enquirer Tried to Protect Him in New Book, *Newsweek*, Oct. 6, 2019, and in 2010, "Epstein pled the Fifth when asked by a lawyer representing one of Epstein's victims about his relationship with Trump." Ken Silverstein, The Salacious Ammo Even Donald Trump Won't Use in a Fight Against Hillary Clinton, *VICE*, Jan. 29, 2016. There is credible evidence that Trump raped young 'Katie,' http://thememoryhole2.org/blog/doe-v-trump, and the existence of a video proving it would be a powerful weapon in the hands of either Vladimir Putin or Bibi Netanyahu, and in turn, that seems to have affected our foreign policy.

[16] E.g., Laura Loomer, X (July 8, 2025, 6:36 PM), https://x.com/LauraLoomer/status/1942654080909775144 (citing [ostensible] FBI document from 2008); Benny Johnson, X (July 9, 2025, 1:50 PM), https://x.com/bennyjohnson/status/1942763354621370669; Gunther Eagleman, X (July 8, 2025, 6:35 PM), https://x.com/GuntherEagleman/status/1942653846087688455. Elon weighs in: "How can people be expected to have faith in Trump if he won't release the Epstein files?" Elon Musk, X (July 8, 2025, 6:33 PM), https://x.com/elonmusk/status/1942653394168246464.

a decade, and is serving as the INTERIM U.S. Attorney because even Trump does not think she stands a snowball's chance in hell of being confirmed. Paul Schwartzman, et al., TV-ready, loyal: Pirro, Trump's pick for top D.C. prosecutor, fits his mold, *Wash. Post*, May 9, 2025. She replaced former Interim U.S. Attorney Ed Martin, "after 15 tumultuous weeks in office marked by his threats to investigate Trump's perceived political adversaries and firings and demotions of career prosecutors who handled cases involving the president and the Jan. 6, 2021, U.S. Capitol attack." Spencer S. Hsu, et al., Trump replaces D.C. U.S. attorney Ed Martin with Fox News host Jeanine Pirro, *Wash. Post*, May 8, 2025.

Pirro has never tried to hide her partisanship. "From the outset of the administration, she has used her TV platform to hammer the president's critics and to ding his allies, including [former AG] Sessions, as insufficiently loyal. She recently described the attorney general as the biggest threat to the Trump agenda, calling him "the most dangerous man in America." Eliana Johnson and Andrew Restuccia, Trump dangled administration job to Judge Jeanine, *Politico*, Jun. 7, 2018. What Pirro either doesn't understand or doesn't care to is that DOJ attorneys take an oath "to support and defend the Constitution," 5 U.S. Code § 3331, not the President. Lauren Miller Karalunas, Presidents Can't Use the Justice Department as Their Personal Law Enforcement Agency, *Brennan Center for Justice*, Feb. 14, 2025 (recounting Attorney General Griffin Bell speech to Justice Department lawyers to address Watergate's fallout). And if I thought that an oath was enough to bind anyone in power in this grotesque caricature of an administration, I would not bother this Court—but the evidence screams otherwise.

There also appears to be an element of *quid pro quo* reminiscent of *The Godfather*: Trump pardoned her ex-husband Albert, "convicted nearly two decades ago on 34 counts of conspiracy and tax evasion after he was found to have improperly deducted over $1 million in lavish personal expenses as a tax write-off for his business." Lucien Bruggeman, Trump issues last-minute pardon to ex-husband of Fox News' Jeanine Pirro, *ABC News*, Jan. 20, 2021. Kiss The Don's ring, get a favor?

As the old saying goes, "a fish rots at the head first." That the DOJ leadership is ethically bankrupt flows naturally from the available evidence, but no one can know how deep the rot goes.

10. Because neither the Attorney General nor the United States Attorney can reasonably be expected to discharge their duties under D.C. Code § 16-3502 in good faith, this Court should grant leave to relator under § 16-3503 to bring this quo warranto petition in the public interest." A remedy "may be inadequate where the administrative body is shown to be biased," *McCarthy v. Madigan*, 503 U.S. 140, 149 (1992), and the law does not ask that a litigant "commit a futile act." *Houghton v. Shafer,* 392 U.S. 639, 640 (1968) (citations omitted).

12

## ALLEGATIONS OF FACT

11.  On or about January 20, 2017, in the process of becoming President of the United States, Respondent Donald John Trump ("Trump") swore the following oath: "I do solemnly swear that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."[17]

12.  Upon a five-day trial on the merits in which Respondent Trump participated as a party, a court of competent jurisdiction[18] found via "clear and convincing evidence" that "Trump engaged in an insurrection on January 6, 2021 [against the United States[19]] through incitement." *Anderson v. Griswold*, No. 23CV32577, ¶¶ 209, 298 (Dist. Ct., City & Cnty. of Denver, Nov. 17, 2023).

13.  The trial court's finding that Respondent Trump engaged in insurrection against the United States was not disturbed on appeal. *Anderson-CO, supra, Trump v. Anderson*, 601 U.S. 100 (2024).

14.  Respondent Trump is collaterally estopped from contesting the trial court's finding that he engaged in insurrection against the United States.[20]

---

[17] This fact was stipulated to in the civil trial. "Intervenor Donald J. Trump served as 45th President of the United States from January 20, 2017, to January 20, 2021. *Id.* ¶ 8. On January 20, 2017, Trump took the Presidential Oath of Office, swearing to "faithfully execute the Office of President of the United States," and "to the best of [his] Ability, preserve, protect and defend the Constitution of the United States." U.S. CONST. art. II, § 1, cl. 8; Stipulation ¶ 9." *Anderson v. Griswold*, No. 23CV32577, ¶ 56 (Dist. Ct., City & Cnty. of Denver, Nov. 17, 2023).

[18] A "court of competent jurisdiction" is a court that has both subject matter jurisdiction and personal jurisdiction over the party against which collateral estoppel is sought, as well as any other jurisdictional requirements necessary to adjudicate the dispute. *Pennoyer v. Neff*, 95 U.S. 714, 722–23 (1878); Restatement (Second) of Judgments § 1 (1982). Colorado district courts are "trial courts of record with general jurisdiction … [with] original jurisdiction in all civil, probate, and criminal cases," with irrelevant exceptions. Colo. Const. art. VI, § 9(1). Trump intervened and tried to remove the case to federal court, *Anderson v. Griswold*, 543 P.3d 283, 298 (Colo. 2023) (hereinafter, "Anderson-CO"), and his voluntary appearance constitutes consent to the court's jurisdiction. *Adam v. Saenger*, 303 U.S. 59, 67-8 (1938). And it has been settled law that state courts have concurrent jurisdiction over federal claims since Colorado became a state. *Claflin v. Houseman*, 93 U.S. 130 (1876). Ergo, the Denver District Court was competent to hear the case.

[19] "In short, the record amply established that the events of January 6 constituted a concerted and public use of force or threat of force by a group of people to hinder or prevent the U.S. government from taking the actions necessary to accomplish the peaceful transfer of power in this country." *Anderson v. Griswold*, 543 P.3d at 331.

[20] Issue preclusion generally bars relitigation when: (1) the issue "being raised must have been contested by the parties and submitted for judicial determination in the prior case"; (2) it "must have been actually and necessarily determined by a court of competent jurisdiction in that prior case," and (3) it "must not work a basic unfairness to the party bound

15. Section 3 of the Fourteenth Amendment to the United States Constitution provides:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

16. The Constitution in general, and the Fourteenth Amendment in particular, is self-executing. *Marbury v. Madison*, 5 U.S. at 177; *see generally, fn. 1, supra.*

17. As evidenced by their treatment of oathbreaking insurrectionist Col. Nathan Tift, the framers of the Amendment regarded it as self-executing. *See fn. 1, supra.*

18. By its terms, "not being an oathbreaking insurrectionist" is a qualification for office, no different from being a natural-born citizen of appropriate age. U.S. Const. art. II, § 1, cl. 5.

19. Congress has not, "by a vote of two-thirds of each House," removed Respondent Trump's "disability." See U.S. Const. amend. XIV, § 3.

20. In a merits brief submitted to the Supreme Court, Respondent Trump admits that Section 3 "does not prevent anyone from *running* for office, or from *being elected* to office, because Congress can remove a section 3 disqualification after a candidate is elected but before his term

---

by the first determination." *Yamaha Corp. of America v. United States,* 961 F. 2d 245, 254 (D.C. Cir. 1992); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5 (1979).

The Parklane Court identifies situations where it would be unfair to apply the doctrine, but none of them seem to apply. If a billionaire is sued for petty cash, he might have "little incentive to defend vigorously, particularly if future suits are not foreseeable." *Parklane,* 439 U.S. at 330. Similarly, a plaintiff might lie in wait, letting others establish the law controlling in the case before taking advantage of his adversary. *Id.* But as Trump fought *Anderson* all the way to the Supreme Court, where the quality of justice you get is a function of your exchequer, *see e.g., Marshall v. Marshall,* 547 U.S. 293 (2006); *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U. S. 280 (2005), and the original lawsuit appeared meritless—owing to the fact that Congress could have removed the disability—any suggestion of "basic unfairness" is facially risible.

begins," further conceding that "Section 3 prohibits individuals only from *holding* office." Brief for Petitioner, *Trump v. Anderson*, No. 23-719, 41 (U.S. Jan. 18, 2024) (emphasis in original).[21]

21.  In a reply brief submitted to the Supreme Court, Respondent Trump did not contest the self-executing nature of Section 3, stating that he "is not arguing that section 3 is 'non-self-executing.' His claim is that section 3 may be enforced only through the congressionally enacted methods of enforcement." Br. for Petitioner in Reply, *Trump v. Anderson*, No. 23-719, 19 (U.S. Feb. 5, 2024).

22.  As the only question of law properly before our United States Supreme Court in *Trump v. Anderson* was whether "the Colorado Supreme Court err[ed] in ordering President Trump excluded from the 2024 presidential primary ballot," *Trump v. Anderson*, No. 23–719, 601 U.S. 100 (2024), Pet. Br. at (i), the question of whether Trump could legally *serve* as President was never before that Court.

23.  As Congress could have removed Trump's disability at any time prior to his ostensible ascension to office if it so chose, the *ratio decedendi* of *Trump v. Anderson, supra.*—that States may not prevent an oathbreaking insurrectionist from appearing on a primary ballot—was both correct and binding.

24.  As a *quo warranto* action is sufficient to enforce Section 3 of the Fourteenth Amendment, see The Enforcement Act of 1870, § 14, 16 Stat. 140, 143 (1870); *repealed*, Act of June 25, 1948, ch. 646, § 39, 62 Stat. 869, 993 (1948), the Supreme Court's extemporaneous discussion in *Trump v. Anderson, supra*, about the need for another statute to enforce it is *obiter dictum*.

---

[21] As Respondent Trump concedes, Congress has, in their infinite wisdom, removed the disability on numerous occasions: "See Cong. Globe, 40th Cong., 2d. Sess., 4499 (July 25, 1868); Cong. Globe, 40th Cong., 3d. Sess., 13–14 (Dec. 7, 1868); Cong. Globe, 40th Cong., 3d. Sess., 120–121 (Dec. 17, 1868); see also id. (statement of Senator Sawyer) ("It is necessary that the disabilities should be removed from these persons before the recess, in order to enable them to qualify for offices to which they have been elected before the 1st of January. . . . [T]hey are men who were selected by the votes of their several localities to fill important local offices.")."" *Trump v. Anderson*, Br. for Pet. at 41.

**Voltaire: "*Il Est Dangereux D'avoir Raison….*"**

As explained earlier, the doctrine of standing is foreign to the Framers' Constitution and especially, in public interest cases, having been grafted onto it by the Taft Court. But as judges are trained to focus on it, I am addressing it here out of an abundance of caution.

America has never tasted the jackboot of fascism, but Respondent Trump is bringing it to our door at a level "like nobody's ever seen before." To take root, Fascism requires ignorance and fear. The autocrats' ultimate goal is to control the information space by stifling dissent. Opposition leaders are targeted, and the judiciary is stripped of its independence. *See e.g.,* Lydia Gall, Hungary's Latest Assault on the Judiciary, *Human Rights Watch*, Dec. 14, 2018. Journalists become targets early on because authoritarians know that controlling information is key to maintaining power. Ruth Ben-Ghiat, *Strongmen: Mussolini to the Present* (Norton: 2020). As Trump's war on the information space, waged from the White House, is violative of the Constitution, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976), and Petitioner is currently being harmed by Respondent's actions, Petitioner has standing to proceed.

25. Whereas Petitioner is cognizant of *Andrade v. Lauer*, 729 F. 2d 1475 (D.D.C. 1984), Justice

Barrett cast grave aspersions on the doctrine of standing, by chastising Justice Jackson last week

in a frameworthy rant:

> We will not dwell on JUSTICE JACKSON's argument, which is at odds with more than two centuries' worth of precedent, not to mention **the Constitution itself**. … JUSTICE JACKSON would do well to heed her own admonition: "[E]veryone, from the President on down, is bound by law." Ibid. **That goes for judges too**.

*Trump v. CASA, Inc.,* No. 24A884, 606 U.S. ___ (2025) (Application for Stay granted Jun. 27,

2025), *slip. op.* at 23, 24 (capitalization in original) (emphasis added).

26. Much as the "nationwide injunction" is a judicial invention of recent vintage, the doctrine

of "standing" in public interest litigation was grafted onto the Constitution by the Taft Court, hav-

ing no foundation in either it or the underlying common law, *Berger, supra.; Jaffe, supra.,* and of

no discernible moment in this matter.

26. However, as Petitioner has conventional standing in spades, this Court should not dismiss this Petition on that ground. Two bases for standing are illustrative:

a. As an author and researcher, Petitioner has a legally cognizable interest in a free press— able to perform its function in society, unencumbered by illicit pressure from Washington. *Virginia State Bd. of Pharmacy,* 425 U.S. at 756–57 (citizen's right to receive information free from government interference): Both ends of the information superhighway are protected by the First Amendment, so that the citizen may serve his intended function as ultimate superintendent of government.

b. Petitioner also has a legally cognizable interest in a free society—where the price of voicing dissent is not a one-way ticket to a gulag in El Salvador—for "if Men are to be precluded from offering their sentiments on a matter, which may involve the most serious and alarming consequences, that can invite the consideration of Mankind; reason is of no use to us—the freedom of Speech may be taken away—and, dumb & silent we may be led, like sheep, to the Slaughter." George Washington, Speech (Newburg, NY), Mar. 15, 1783.

28. As Senior Judge J. Harvie Wilkerson of the Fourth Circuit recently observed, the threat to American citizens is no longer theoretical:

> If today the Executive claims the right to deport without due process and in disregard of court orders, what assurance will there be tomorrow that it will not deport **American citizens** and then disclaim responsibility to bring them home?∗ And what assurance shall there be that the Executive will not train its broad discretionary powers upon its political enemies? **The threat, even if not the actuality, would always be present**, and the Executive's obligation to "take Care that the Laws be faithfully executed" would lose its meaning. U.S. CONST. art. II, § 3; see also id. art. II, § 1, cl. 8.

*Abrego-Garcia v. Noem*, No. 25-1404, slip op. at 5 (4th Cir. Apr. 17, 2025) (emphasis added).

Footnote in opinion: See, e.g., Michelle Stoddart, 'Homegrowns are Next': Trump Doubles Down on Sending American 'Criminals' to Foreign Prisons, *ABC NEWS* (Apr. 14, 2025, 6:04 PM); David

Rutz, *Trump Open to Sending Violent American Criminals to El Salvador Prisons, FOX NEWS* (Apr. 15, 2025, 11:01 AM EDT).

27.  As an author and scholar, Petitioner has an identifiable and personal interest in receiving full and accurate information, and in the infamous words of Donald Rumsfeld, "there are also **unknown unknowns—the ones we don't know we don't know.**" Donald Rumsfeld, Press Briefing, Dept. of Defense, Feb. 12, 2002 (emphasis added). Knowledge is power, a current which the Respondent and his agents have illicitly short-circuited.

28.  As a politically active and law-abiding citizen cursed with a sharp tongue who has participated in protests against the Respondent's regime and can reasonably be expected to do so in the future, Petitioner has an identifiable and personal interest in being free from arbitrary arrest and detention.

29.  On information and belief, in light of the illegitimate and activist Supreme Court decision in breathtaking defiance of the historical record granting an almost plenary immunity to the President from criminal liability,[22] the unfettered pardon power, and de facto control of the mechanism

---

[22] **I. "WE HAVE A KING!" DECLARING *TRUMP V. UNITED STATES***



As Clarence Thomas solemnly observes, "[w]e should always start, when we read the Constitution, by reading the Declaration [of Independence], because it gives us the reasons why the structure of the Constitution was designed the way it was." Clarence Thomas, A Conversation with Justice Clarence Thomas, 36-10 *Imprimis* (Oct. 2007). The Framers designed their Constitution to prevent unchecked executive power—a principle rooted in their experience under King George III, as chronicled in the Declaration.

To a man, the Framers were adamant in their opposition to a grant of criminal immunity to the President. James Wilson told the Pennsylvania ratifying convention that the president was "far from being above the laws," and "not a

single privilege [was] annexed to his character." 2 *Elliot's Debates* 480. Contrasting the President to the King, Alexander Hamilton assured the public that the president, unlike a monarch, "would be liable to prosecution and punishment in the ordinary course of law." *The Federalist* No. 69, 396-97 (Hamilton). Some years later, Charles Pinckney confirmed that "[n]o privilege of this kind was intended for your Executive, nor any except that which I have mentioned for your Legislature." Sen. Charles Pinckney (D/R-SC), Speech (in the United States Senate), Mar. 5, 1800, 3 *Farrand* 384-85. Noting "no subject had been more abused than privilege," he added that the Framers "set the example in merely limiting privilege to what was necessary, and no more." Id. **There is no contrary authority.'**

Whereas the Framers' public views carry the most probative value, it was generally understood that the president's accountability to prosecution would distinguish American leaders from European monarchs. In a September 1787 essay, Tench Coxe emphasized that the president could be "proceeded against like any other man in the ordinary course of law." An American Citizen I, *Indep. Gazetteer* (Philadelphia, Pa.) (Sept. 26, 1787), reprinted in 2 *Documentary History of Ratification* ("DHR") 138, 141. As "Americanus," a supporter of the Constitution from New Jersey, observed, the British king was "above the reach of all Courts of law," but this "prerogative[]" was not "vested in the President." Americanus II, *N.Y. Daily Advertiser* (Nov. 23, 1787), reprinted in 19 *DHR* 287, 288-89. Patrick Henry found this to be a flaw asserting that "we may prescribe the rules by which he shall rule his people, and interpose such checks as shall prevent him from infringing them, but the President, in the field, at the head of his army, can prescribe the terms on which he shall reign." 3 *Elliot's Debates* 59-60 (Patrick Henry) (noting in opposition to the president's control over the army in the draft Constitution that a president who committed a crime might try to use the army to avoid "being ignominiously tried and punished"), presaging the concern Justice Sotomayor voiced in her dissent.

Senator William Maclay (Anti-Administration-PA) asked what would happen in the case of a murderous president: "Suppose the President committed murder in the street. Impeach him? . . . But [suppose] . . . he runs away. But I will put up another case. Suppose he continues his murders daily, and neither House is sitting to impeach him." William Maclay, *The journal of William Maclay, United States Senator from Pennsylvania, 1789-1791,* 163 (Chas. A. Beard ed., 1927) (1965). "Senator William Grayson of Virginia was adamant that the 'President was not above the law,' arguing that presidents likely would be sued and that they might be prosecuted for murder." Saikrishna Prakash, *Prosecuting and Punishing Our Presidents,* 100 Tex. L. Rev.55, 74-5 (2021). Others underscored that the president could be "tried for his crimes," see Publicola: An Address to the Freemen of North Carolina, State Gazette of N.C. (Mar. 27, 1788), reprinted in 30 DHR Digital Edition 113, 116 (Kaminski et al. eds., 2009) and was "liable . . . to be indicted if the case should require it," see A Freeholder, *Va. Indep. Chron.* (Apr. 9, 1788), reprinted in 9 DHR 719, 723. The Federal Farmer was more concerned that the President would use his office to get re-elected, "Federal Farmer," The Character of the Executive Office, *Antifederalist No. 69,* reprinted at https://www.history1700s.com/index.php/the-united-states-constitution-reference/the-anti-federalist-papers/1178-antifederalist-no-69.html. On the privileges of king and lords, Tucker states: "The fundamental principle of the American Constitutions and governments, being the perfect equality of rights, there was no room to admit any thing therein, that should bear the most distant resemblance to the subject of this chapter." 2 St. George Tucker, *Blackstone's Commentaries* 219 n.1. (1803). As Chief Justice Marshall put it, "the president is elevated from the mass of the people and, on the expiration of the time for which he is elected, returns to the mass of the people again." *United States v. Burr,* 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, C.J., riding circuit) (emphasis added). Therefore, "the first magistrate of the Union may more properly be likened to the first magistrate of a state," rather than to a "monarch." *Id.* Again, **there is no contrary authority**.

Unlike the question of criminal immunity, the efficacy of impeachment was discussed by the Framers. The danger being guarded against, in the words of Madison, was that "the chief Magistrate ... might pervert his administration into a scheme of peculation or oppression [or] betray his trust to foreign powers." Notes on the Constitutional Convention (July 20, 1787), 2 *Farrand* 65-66. Colonel Mason all but predicted a crime Mr. Trump was indicted for: "Shall the man who has practised corruption [through bribing Electors] & by that means procured his appointment in the first instance, be suffered to escape punishment, by repeating his guilt?" Id. at 65. Ben Franklin, in reasoning against any monarchical-like system which would place the chief executive beyond the reach of the law, argued it would be "best ... to provide in the Constitution for the regular punishment of the Executive when his misconduct should deserve it." *Id.* **When Ben Franklin disagrees with you, you probably need to double-check your work.**

Consistent with this view, the Framers made it a point not to grant immunity from criminal prosecution to the President. No reference can be found in the Constitution, its penumbrae, or its emanations. *See* Antonin G. Scalia, *Historical Anomalies in Administrative Law,* Y.B. Sup. Ct. Hist. Soc'y. 103 (1985). Presidential immunity has no

"grounding in constitutional text, history, or precedent." *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 280 (2022), 142 S. Ct. 2228.

## II.  JUDGES GONE WILD: HOW A PRESIDENT BECOMES AN EMPEROR

Few flights of judicial fancy have ever been as reckless.

Every single judge in the *Trump v. United States* majority knew better. Why? **BECAUSE THEY TOLD US SO.** Writing for the Court, Chief Justice Roberts confessed that "Members of this Court are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them." *Nat. Fedn. of Indep. Business v. Sebelius*, 567 U.S. 519, 132 S.Ct. 2566, 2579 (2012). Every Justice in the majority—Roberts, Thomas, Alito, Gorsuch, Kavanaugh, Barrett—publicly warranted that they can't change the Constitution to suit their pleasure:

> (**Roberts**: "Judges have power to say what the law is, not what it should be." *Obergefell v. Hodges*, 576 U.S. 644, 135 S.Ct. 2584, 2811 (2015) (Roberts, C.J., dissenting); **Thomas**: "Judicial power… is never exercised for the purpose of giving effect to the will of the Judge." *Gamble v. United States*, 587 U.S. 678, 139 S.Ct. 1960, 1982 (2019) (Thomas, J., concurring); **Alito**: "It is the job of a judge… to interpret the Constitution, not distort [it]," Confirmation Hearing on the Nomination of Samuel A. Alito, Jr. To Be an Associate Justice of the Supreme Court of the United States: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 465 (2006) (statement of Samuel A. Alito, Jr.); **Gorsuch**: "Ours is the job of interpreting the Constitution… according to its original public meaning," *Cordova v. City of Albuquerque,* 816 F.3d 645, 661 (10th Cir. 2016) (Gorsuch, J, concurring); **Kavanaugh**: "The Constitution does not grant [us] unilateral authority to rewrite" it, *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, __, 142 S.Ct. 2228, 2306 (2022) (Kavanaugh, J. concurring); **Barrett**: "Partisan politics are not a good reason for deciding a case." Amy C. Barrett, Precedent and Jurisprudential Disagreement, 91 Tex. L. Rev. 1711, 1729 (2012-13)).

For five centuries, it has been universally understood that the office of the judge "is *jus dicere*, and not *jus dare*; to interpret law, and not to make law, or give law." Francis Bacon, *Essays LVI* (Of Judicature) (1620). Mindful that "the discretion of the judge is the first engine of tyranny," 4 C. Gibbon, *The History of the Decline and Fall of the Roman Empire* 385 (1776-89) (Philips Samson, and Co. 1856), Alexander Hamilton argued that to "avoid an arbitrary discretion in the courts, it is indispensable that [judges] should be bound by strict rules and precedents, which serve to define and point out their duty in every particular case before them." *The Federalist* No. 78, 470 (I. Kramnick ed. 1987) (Alexander Hamilton). Blackstone asserted that the judge's duty to follow precedent derived from the nature of the judicial power itself: a judge is "sworn to determine, not according to his own judgments, but according to the known laws." 1 Blackstone, *Commentaries* at 69. A century earlier, Coke observed that "[i]t is the function of a judge not to make, but to declare the law, according to the golden mete-wand of the law and not by the crooked cord of discretion." 1 E. Coke, *Institutes of the Lawes of England* 51 (1642).

Professor (Justice) Story adds that "A more alarming doctrine could not be promulgated by any American court, than that it was at liberty to disregard all former rules and decisions, and to decide for itself [what the law is], without reference to the settled course of antecedent principles." 1 J. Story, *Commentaries on the Constitution of the United States* 350 (1838). The judge was expected to be little more than an administrator, playing what Professor Llewellyn called "the game of matching cases." Karl Llewellyn, *The Bramble Bush* 49 (1960).

Under our system, the judicial power is "to decide what the law is, not to declare what it should be," *Minor v. Happersett*, 88 U.S. 162, 178 (1874), for as long as judges are at liberty to "substitute their own pleasure to the constitutional intentions of the legislature," *The Federalist* No. 78 at 440 (Alexander Hamilton)—or the people—it can no longer honestly be said that we are a nation governed by laws. The rewriting of the Constitution under a false pretense of interpreting it is "a flagrant perversion of the judicial power." *Heiner v. Donnan*, 285 U.S. 312, 331 (1932). In the timeless words of Justice Holmes, it is 'an unconstitutional assumption of powers by courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938). "Courts are constituted by authority and they can not go beyond the power delegated to them. If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as nullities." *Vallely v. Northern Fire & Marine Ins. Co.*, 254 U.S. 348, 353 (1920). **There is no contrary authority.**

But when you are besotted with untrammeled power, nothing can stop you.

## III. "THE KING CAN DO NO WRONG!"



*The King can do no wrong, in a land without a king.* To even state the majority Justices' declaration in *Trump v. United States*, 603 U.S. 593 (2024), is to refute it. But what is important here is what was taken away. One of the blessings of liberty the Framers gave us was the freedom not to be harmed by the King for any reason or no reason at all. In the Framers' day, if the President committed a crime against you, you could initiate a private criminal prosecution. *See e.g.,* Emma Kaufman, *The Past and Persistence of Private Prosecution,* 173 U.Penn.L.Rev. 89 (2024-25) (chronicling the history of and judicial erosion of the right, which still is in force in some form all over the civilized world). But after *Trump v. United States*, if the President wanted to grab you off the street and send you to a gulag half-way around the world, there would literally be nothing you could do about it: He could pardon his minions and then, hide behind a cloak of judicially conjured immunity.

What makes this covert judicial flight to El Salvador so outrageous is that none of the Justices were not writing from a blank slate. Everything they said on the record beforehand would have led the reasonable citizen to believe that they had all concluded that the notion that our President enjoyed almost limitless immunity from criminal prosecution was fifty shades of absurd.

Prior to issuing the ruling in *Trump v. United States*, Justice Kavanaugh admitted that the President did not enjoy criminal immunity. As he was an adjunct professor at Harvard who worked for independent counsel Kenneth Starr and had written a scholarly piece on the subject, Brett M. Kavanaugh, *The President and the Independent Counsel,* 86 Geo. L.J. 2133 (1998), his was the most full-throated answer:

> "No one has ever said, I do not think, that the president is immune from civil or criminal process," Kavanaugh said. "So immunity is the wrong term to even think about in this process." He added, "But immunity is not — not the correct word, and I do not think anyone thinks of immunity. And why not? No one is above the law. And that is just such a foundational principle of the Constitution and equal justice under law."

Aaron Blake, What conservative justices said about immunity — before giving it to Trump, *Wash. Post,* Jul. 2, 2024 (hereinafter, "Blake"). And in a response to Senator Grassley (R-IA) regarding suspicion that he would rule that the President enjoys broad immunity from criminal liability, he explained why:

> No one is above the law in our constitutional system. Federalist 69, Hamilton makes clear all the ways that the executive branch, as designed by the Framers of the Constitution, was different from the monarchy. Under our system of Government, the executive branch is subject to the law, subject to the court system, and that is an important part of Federalist 69. It is an important part of the constitutional structure.

S. Hrg. 115-545, Pt. 1, *Confirmation Hearing on the Nomination of Hon. Brett Kavanaugh to be an Associate Justice of the United States* 119 (Sept. 4-7, 2018) (stmt. of Judge Kavanaugh). Similar statements from the hearing are compiled in video form. Conover Kennard, Brett Kavanaugh In 2018 Disagrees With Brett Kavanaugh of 2024, *Crooks&Liars.com,* Jul. 2, 2024, https://crooksandliars.com/cltv/2024/07/brett-kavanaugh-2018-disagrees-brett (video only).

of federal law enforcement, the citizen has no practical defense against the criminal depredations

of the new Crown.

30.   On information and belief, in a notorious incident, Respondent Trump has used the powers

of the Presidency to imprison a writer critical of him, *Cohen v. Barr*, No. 20-CV-5614 (S.D.N.Y.

July 23, 2020)— U.S. District Judge Alvin K. Hellerstein ordered Cohen's release to home con-

finement, finding that the government's reimprisonment was "retaliatory in response to Cohen

---

Although examined less directly, when asked whether a President had criminal immunity, all the other named Justices agreed under oath that he did not.  When they were applying for the job of Justice, the Justices averred that "no man was above the law." ("I believe that no one is above the law under our system, and that includes the President. The President is fully bound by the law, the Constitution and statutes." S. Hrg. 109–158, *Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States* 152 (2005) (stmt. of Judge Roberts); "No man is above the law. … No man." S. Hrg. 115–208, *Confirmation Hearing on the Nomination of Hon. Neil Gorsuch to be an Associate Justice of the United States* 113 (2017) (stmt. of Judge Gorsuch); "Barrett said three times that nobody was 'above the law' while responding to questions about the president" and Alito stated that "no person in this country is above the law, and that includes the president and it includes the Supreme Court." Aaron Blake, What conservative justices said about immunity — before giving it to Trump, *Wash. Posto,* Jul. 2, 2024).

Again, <b>THEY ALL SAID IT <u>UNDER OATH</u></b>.

But without any colorable support in or reference to the law—and in inexplicable disregard of their own public positions—the Justices decided *sua sponte* that Presidents ought to be above the law.  Never mind that they all admitted that making policy decisions was above their pay grade.  Ergo, at the time they were asked to consider the case, by all rights, they should have been predisposed to not even grant certiorari review.

But it gets worse.  Writing for the majority, Chief Justice Roberts indulged in a policy-driven argument to justify a result unsupported by text, history, precedent, or the Justices own earlier statements.  There may be reasonable arguments for why a President should be immune from criminal prosecution--but the Court is not the place for that debate. It bears repeating that Roberts himself declared:

> "Members of this Court are vested with the authority to interpret the law; **we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders**, who can be thrown out of office if the people disagree with them." *NFIB v. Sebelius,* 567 U.S. 519, 132 S.Ct. at 2579 (emphasis added).

This should freeze the blood of any American.  In a raw exercise of power, the majority gave a petty and vindictive dictator-in-training the power of an Emperor, in flagrant disregard of our laws.  They did it arbitrarily, and without regard for the Constitution, legislative history, and common sense.  This is a disgrace so profound that it makes the *Dred Scott* decision look like a typo.

> *Take all the robes of all the good judges that have ever lived on the face of the earth and they would not be large enough to cover **the iniquity of one corrupt judge**. … Nothing can atone for, nothing can palliate his wickedness. No words can be too fiery, no edge too sharp, no thunder too mighty, and no lightning too hot, to scorch such a man.*
> ~Rev. Henry Ward Beecher

Rev. Henry Ward Beecher, "Works Meet for Repentance" (sermon) Dec. 20, 1868, reprinted in *Plymouth Pulpit,* Vol. 1, Iss. 15 (Ford & Co. 1869) at 241.

intending to exercise his First Amendment rights to publish a book critical of the President and to discuss the book on social media." *Id.,* ECF #30.

31. Based on court rulings, in administration of the office of the Presidency, Respondent and his agents have demonstrated open and notorious contempt for the rule of law and judicial orders expounding it on repeated occasions. *E.g., Abrego-Garcia v. Noem, supra.* (defiance of court order); *J.G.G. v. Trump,* No. 25-766 (JEB) (D.D.C. Apr. 16, 2025) (probable cause for finding of contempt); see e.g., Alison Durkee, Could Trump Officials Be Prosecuted? What To Know After Judge Finds Evidence Of Criminal Contempt For El Salvador Flights, *Forbes,* Apr. 16, 2025.

32. On information and belief, Respondent Trump is building an enormous secret police force (photo above), manned by gangs of unknown masked gunmen, e.g., Mary Harris, ICE Officers Keep Hiding Their Faces. Someone Is Going to Get Hurt, *Slate,* Jul. 3, 2025, with zero accountability, reminiscent of Russia's siloviki.[23]

33. On information and belief, Respondent Trump has used the office of the President to intimidate and browbeat mainstream media outlets and universities into altering their coverage to conform with his view of the world, and the law firms[24] Petitioner might need one day to defend his legal interests. See e.g., the *Washington Post*—which Petitioner subscribes to.[25]

---

[23] One Big Beautiful Bill Act, H.R. 1, § 100052, 119th Cong. (2025) (appropriating $29,850,000,000 to U.S. Immigration and Customs Enforcement for enforcement and deportation operations, including personnel recruitment, transportation, 287(g) program expansion, facility upgrades, fleet modernization, and support for victims of immigration crimes, available until September 30, 2029). This is at least a ten-fold increase in funding, begging the question of why it would be needed. Between Presidential immunity, pardons, and plenary control of the gears of prosecution, any act committed by Trump's enormous private army would be unreachable by the arm of the law.

[24] On information and belief, Respondent Trump's *in terrorem* campaign against major law firms transforms some of the world's most capable firms (here, Skadden, Arps) into his own in-house lawyers, working on his "pet projects." Brenna Trout Frey, Skadden Resignation (LinkedIn), reprinted at Anna Bower (@AnnaBower), X (Mar. 28, 2025, 11:42 PM), https://x.com/AnnaBower/status/1905767419765018936; Daniel Barnes, Major law firm strikes preemptive deal with White House, *Politico,* Mar. 28, 2025 ($100,000,000 anticipatory capitulation arrangement).

[25] The *Washington Post* is one of the two de facto "papers of record" in America, traditionally serving as a reliable first draft of history. On information and belief, the *Post* is owned by centi-billionaire Jeff Bezos. Benjamin Mullin and Katie Robertson, A Decade Ago, Jeff Bezos Bought a Newspaper. Now He's Paying Attention to It Again, *N.Y. Times,* Jul. 23, 2023. On information and belief, Bezos is the largest shareholder of e-commerce megalith Amazon,

34. On information and belief, even the White House Correspondents' Association has surrendered, preemptively canceling comedian (and fierce Trump critic) Amber Ruffin as the headliner for its annual dinner. Giselle Ruhiyyih Ewing, White House Correspondents' Association cancels comedian headliner for annual dinner, *Politico*, Mar. 29. 2025.

---

and those holdings comprise a large portion of his wealth. Notice of 2024 Annual Meeting of Shareholders & Proxy Statement, *Amazon, Inc.,* May 22, 2024, at 84.

In 2024, the *Washington Post* refused to endorse a candidate for President. David Folkenflik, 'Washington Post' won't endorse in White House race for first time since 1980s, *NPR*, Oct. 25, 2024. On information and belief. the refusal to endorse was not a principled decision, but one of genuflection toward Respondent Trump. David Bauder. Newspaper non-endorsements at Washington Post, LA Times fit a trend, but their readers aren't happy, *AP*, Oct. 29, 2024; Several editorial board members resigned, and "Washington Post legends Bob Woodward and Carl Bernstein issued a statement saying: 'We respect the traditional independence of the editorial page, but this decision 12 days out from the 2024 presidential election ignores the Washington Post's own overwhelming reportorial evidence on the threat Donald Trump poses to democracy.'" Manuel Roig-Franzia and Laura Wagner, The Washington Post says it will not endorse a candidate for president, *Wash. Post*, Oct. 25, 2024. Observing that "it is asking a lot of readers not to suspect that Bezos's personal business interests play no role" in his editorial changes, veteran columnist Ruth Marcus recently re-signed from the *Post*. Ruth Marcus, Why I Left the Washington Post, *The New Yorker*, Mar. 12, 2025.

On information and belief, Bezos is currently in the process of decapitating the Washington Post reporting staff, replacing them with right-wing ideologues. Erkki Forster, The Washington Post Looks to Recruit Right-Wing Journalists, *The Daily Beast*, Mar. 5, 2025. On information and belief, Bezos' payments to the Trump family and editorial shift function as a de facto inducement or quid pro quo arrangement to secure favorable USPS access and shield Amazon from anti-trust enforcement under the Trump Administration. Grok summarizes the new *Apprentice* airing thusly: "In short, Amazon hasn't 'bought' the rights anew in 2025; it leverages its existing MGM ownership to stream *The Apprentice*, reinforcing its strategic ties with the Trump family as of March 27, 2025," describing "Amazon's pattern of Trump-related investments." Grok 3, Mar. 28, 2025 (Query: "Has Amazon bought the rights to The Apprentice?"; screenshots retained). Musk describes Grok 3 as "the smartest AI on earth," Matt High, Why Elon Musk Claims Grok-3 is the World's 'Smartest AI', *AI Magazine*, Feb. 19, 2025, and Petitioner need not quibble here.

Amazon's antitrust exposure could have a seismic effect on its market value. Respondent Trump is known to have had a long-standing relationship with DeutscheBank; while New York and U.K. regulators slapped the bank with a combined $630 million fine for Russian money laundering, Karen Freifeld and Arno Schuetze Deutsche Bank fined for $10 billion sham Russian trades, *Reuters*, Jan. 31, 2017, federal regulators under Trump made a similar probe 'go away'; "The DOJ investigation has been closely watched by Democrats on Capitol Hill who have tried and failed to get Deutsche Bank to turn over its internal investigation into the Russian trades and a separate internal review into whether bank accounts of President Donald Trump and his family have any ties to Russia." Kara Scannell, DOJ Probe on Russian Trades Through Deutsche Bank Quiet, *CNN Politics*, Nov. 15, 2017. *Russia, Russia, Russia*! **Guess it pays to know the Boss.**

On information and belief informed by expert assessment, the relationship between Bezos' financial dealings with Respondent Trump and editorial shifts at the *Washington Post* cannot be seen as coincidental but instead, reflects his self-censorship of the Post under implicit coercion, fearing Trump's retaliation if he does not comply. Bezos' behavior mirrors that of journalists and media outlets in authoritarian regimes, where leaders use legal threats, financial ruin, or physical harm to induce self-censorship: "The strongman's media strategy often relies on intimidation rather than outright bans, encouraging self-censorship among journalists and outlets eager to survive." Ruth Ben-Ghiat, *Strongmen: Mussolini to the Present* 112 (Norton: 2020).

35. Respondent Trump has used objectively baseless lawsuits backed by his privileged position to extort funds from major media outlets and cement his dominance. E.g., *Trump v. Selzer*, No. 4:24-cv-00449 (S.D. Iowa filed Dec. 17, 2024), (complaining about a *Des Moines Register* opinion poll), *Trump v. CBS News*, No. 2:24-cv-00206, (N.D. Tex., filed Oct. 31, 2024) (alleged deceptive editing of a *60 Minutes* interview with Kamala Harris, seeking $10 billion), *Trump v. Simon & Schuster*, No. 2:23-cv-00068 (M.D. Fla. filed Jan. 30, 2023) (Donald Trump lies; Bob Woodward tapes everything): With a pending merger and FCC factors clearly central to Paramount's decision to capitulate, this episode underscores the growing ease with which political power can be wielded to shape editorial outcomes in American media. Sara Fischer, Paramount agrees to settle Trump lawsuit for $16 million, *Axios*, Jul. 2, 2025.

36. On information and belief, Respondent Trump indicated his intention to weaponize the Department of Justice in an effort to assert dominance over the information space in a speech:

> "The Washington Post, The Wall Street Journal and MSDNC, and the fake news, CNN and ABC, CBS and NBC, they'll write whatever they say," Trump said. "And what do you do to get rid of it? You convict Trump."
> "It's totally illegal what they do," Trump continued, addressing DOJ employees. "I just hope you can all watch for it, but it's totally illegal."
> While Trump did not immediately clarify who "they" are, he later claimed that CNN and MSNBC are "political arms of the Democrat Party."

Liam Reilly, Trump baselessly accuses news media of 'illegal' behavior and corruption in DOJ speech, *CNN,* Mar. 14, 2025.

37. Viewed *in pari materia*, Respondent's actions constitute an ongoing and direct infringement on Petitioner's First Amendment rights to receive information, engage in political advocacy, and access legal representation without fear of state-coerced retaliation, as both ends of the proverbial

"firehose of information" protected by the First Amendment are currently and will continue to be

materially impaired, *e.g., Virginia State Bd. of Pharmacy, supra.*, absent relief.[26]

## CONCLUSION

> *Truth is stranger than fiction, but it is because Fiction is obliged to stick to possibilities; Truth isn't.*
>
> ~Mark Twain[27]

AutopenGate.  If you need people to forget that you're hiding the Epstein List because Jeff Epstein invoked the Fifth when asked to testify about you, Silverstein, *Salacious Ammo*, supra., any port in a storm will probably do.  But Respondent Trump referred to it as "one of the biggest scandals that we've had in 50-100 years." Eric Daugherty (@EricLDaugh), X (July 14, 2025, 3:51 PM), https://x.com/EricLDaugh/status/1944786746937348127 (video is embedded).  Really?  But this one definitely tops it.

> Respondent Donald Trump is not the President of the United States. He is merely occupying the office—illegally, and in open defiance of the Constitution he once swore to preserve.

The Constitution is a stern mistress, which does not brook infidelity.  I didn't make the rules, but have a right to insist that they be followed scrupulously.

---

[26] While it isn't constitutionally required in a public interest case, the requirements for standing (*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) and a temporary restraining order are essentially coterminous here.

This set of facts would also cover the waterfront for a TRO.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).  As it is logically impossible for an oathbreaking adjudged insurrectionist who has not been absolved by Congress to serve as our President, U.S. Const. amend. XIV, § 3, Doe is certain to succeed on the merits, if our Constitution is to stand for anything.  Doe's legally cognizable interest is in a free press—able to perform its function in society, unencumbered by illicit pressure from Washington, *Virginia State Bd. of Pharmacy,*, 425 U.S. at 756–57 (right to receive information free from government interference)—constitutes an irreparable injury.  *Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

While the balancing of equities is inescapably fact-specific, this Circuit uses the sliding scale approach predating *Winter*: "An injunction may be justified … where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  Chief Judge Boasberg has suggested "that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." Strobos v. RXBio, Inc., 221 F. Supp. 3d 21, 22 (D.D.C. 2016). "[T]he plaintiff bears the burden of persuasion on all four preliminary injunction factors in order to secure such an extraordinary remedy," *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016), but this is an extraordinary case. Petitioner respectfully submits that this burden is met here, and the public interest cannot possibly be served by a usurper feasting off our national throne.

[27] Mark Twain, *Following the Equator* 68 (1897) (undated e-text reproduction at https://cdn.fulltextarchive.com/wp-content/uploads/wp-advanced-pdf/1/following-the-equator.pdf )

It is "a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, when ever that right is invaded." *Marbury v. Madison*, 5 U.S. at 163 (quoting Blackstone). "Every [English] subject,' said Justice Lush, "has an interest in securing that public duties shall be exercised only by those competent to exercise them." *Berger, Standing to Sue*, 78 Yale L. Rev. at 823 & n. 39. To achieve that end, our legislators have passed the statutory remedy invoked in this Petition. Trump is sued here in his personal capacity, as a usurper cannot act in an official capacity.

As Justice Roberts observed, "the Government should turn square corners in dealing with the people." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 24 (2020) (quoting Justice Black). It seems redundant to swear out an oath in a petition where I am obliged to tell the truth to the Court already. It seems absurd for me to attest personally to facts which are judicially noticeable. I have stated controlling law to the best of my ability. I am entitled to rely to an appropriate degree on the news of the day, and indicate said reliance. Legal conclusions grounded in judicially noticeable facts need no further support. On these points, the law can ask no more. What remains is the legally protected interests I seek to vindicate, which I attest to—without reservation—herein, under oath.

The controlling statute grants federal authorities a right of first refusal, but for reasons stated herein, those designated authorities are structurally and ethically compromised. Where further delay would be inimical to the statute's purpose, and where waiting would almost certainly be futile, this Court has the equitable power to proceed. *McCarthy, supra., Houghton, supra.* I therefore respectfully request that the Court issue a writ of quo warranto without delay.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

FURTHER AFFIANT SAYETH NOT.

Dated: _July 23_, 2025

K.L. Smith
3649 Evergreen Pkwy. #504
Evergreen, CO. 80437-0504
Manncoulter.fox@gmail.com
(720) 404-5383

State of Colorado
County of _JEFFERSON_

This record was acknowledged before me on _JULY 23, 2025_ by
_KENNETH L. SMITH_

Notary's Official Signature                    (Seal)
Title of Office: _PERSONAL BANKER_
My Commission Expires: _3/13/2027_

**JOHN P MORRISON**
**NOTARY PUBLIC**
**STATE OF COLORADO**
**NOTARY ID 20234009778**
**MY COMMISSION EXPIRES 03/13/2027**

27

## ADDRESSES OF DEFENDANT:

**Donald John Trump,**
  1600 Pennsylvania Ave.,
  Washington, DC 20500 (place of abode)

  Mar-a-Lago,
  1100 S Ocean Blvd,
  Palm Beach, FL 33480 (domicile)

  [As it is alleged herein that Mr. Trump is not our President *de jure, Norton, supra.*, the proper situs for service of process is either his place of abode or place of domicile. A subpoena and copy of the Petition will be served on both locations.]

Aug. 29, 2025

**Donald John Trump,**
   1600 Pennsylvania Ave.,
   Washington, DC 20500 (place of abode)

   Mar-a-Lago,
   1100 S Ocean Blvd,
   Palm Beach, FL 33480 (domicile)

   [As it is alleged herein that Mr. Trump is not our President *de jure*, the proper situs for service of process is either his place of abode or place of domicile. A summons and copy of the Petition are being served on both locations. As this is, rather by definition, a personal capacity action, the Answer is due in 21 days.]

Dear Mr. Trump:

Enclosed please find an original and one copy of the Summons and Verified Petition in the matter of *Smith v. Trump*, No. 2025-CAB-004825, in the Superior Court of the District of Columbia.

Respectfully,

K.L. Smith
3659 Evergreen Pkwy. #504
Evergreen, CO. 80437-0504
Manncoulter.fox@gmail.com
(720) 404-5383

Cc: Pamela J. Bondi, United States Attorney General
      Jeannine Pirro, United States Attorney
           for the District of Columbia



CERTIFIED MAIL

36.49 EVERGREEN PKWY #204
EVERGREEN, CO
80437-0504

9589 0710 5270 3121 2032 89

U.S. POSTAGE PAID
FCM LG ENV
GOLDEN, CO 80401
AUG 29, 2025

$12.70

RDC 99

20530

S2324K502765-9

Tracking No. 9889071052703123200899
USAO-PHB
-PHB -

Building:
Room:
Dept:
Received On: 09/08/2025 08:16:11am
Route:

DOJ-FASS

Civil Division
SEP 8 2025
US Attorney's Office DC

US ATTY FOR THE
DISTRICT OF COLUMBIA
601 D ST. NW
WASH., DC
20530

X-RAYED 65

SEP 08 2025

DOJ MAIL ROOM

Civil Division
SEP 8 2025
US